1  **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8

9  Wilderness Watch, et al.,                )    No. CV-07-1185-PHX-MHM
                                            )
10              Plaintiffs,                 )
                                            )    **ORDER**
11  v.                                      )
                                            )
12                                          )
    U.S. Fish and Wildlife Service, et al., )
13                                          )
                                            )
14              Defendants.                 )
                                            )
15  _____)

16        Wilderness Watch, the Arizona Wilderness Coalition, the Sierra Club, the Western

17  Watersheds Project and the Grand Canyon Wildlands Council (collectively "the Plaintiffs")

18  filed the instant suit on June 15, 2007 against the United States Fish and Wildlife Service

19  ("the FWS" or "the Defendant"). (Dkt. #1). This Court granted motions to intervene by the

20  U.S. Sportsmen's Alliance Foundation (as well as various other groups, collectively referred

21  to here as "the Sportsmen") and the State of Arizona. (Dkt. #102).

22        According to the Plaintiffs' Amended Complaint, the Defendant violated the National

23  Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370, and the Wilderness Act, 16

24  U.S.C. §§ 1131-1136. (Dkt. #50). These allegations arise from the decision of the FWS to

25  authorize the construction of two water tanks within the Kofa National Wildlife Refuge near

26  Yuma, Arizona, in order to provide supplemental water for wildlife.

27        The Plaintiffs allege that the construction of permanent structures and the use of

28  motorized vehicles within a designated wilderness area violated the Wilderness Act. The

1   Plaintiffs also assert that the FWS inappropriately invoked a "categorical exclusion" to
2   NEPA's public notice and comment requirements.

3       The Plaintiffs moved for summary judgment on December 14, 2007.  (Dkt. #78).
4   Cross-motions for summary judgment were filed by the Defendant, the State of Arizona, and
5   the Sportsmen. (Dkt. #85, 81 and 93).  Having considered the motion and cross-motions for
6   summary judgment, oral argument, the administrative record in the case, the extra-record
7   evidence submitted by the Plaintiffs, as well as an amicus brief submitted by Public
8   Employees for Environmental Responsibility, the Court issues the following Order.

9                                  I. Background

10      The following facts are taken from the parties' respective statements of facts and are
11  undisputed.

12  A.  The History of Kofa and Bighorn Sheep

13      The Kofa Game Range was established in 1939.  In November of 1990, certain lands
14  within the Kofa National Wildlife Refuge were designated as wilderness under the
15  Wilderness Act.  The Kofa Wildlife Refuge consists of approximately 665,400 acres, of
16  which approximately 510,000 acres are designated "wilderness area."  The wilderness area
17  is comprised of rugged, desert terrain north of Yuma, Arizona.

18      The Kofa Wilderness is home to a variety of wildlife, including desert bighorn sheep.
19  In fact, one of the reasons that the Kofa Wildlife Refuge was established was to protect
20  bighorn sheep.  Desert bighorn sheep occupy high, rocky, arid areas like the habitat found
21  in the Kofa Wilderness.

22      In October 2006, the population of desert bighorn sheep on the Kofa had declined to
23  an estimated 390, down from an estimated 813 in October of 2000.  Following the
24  recognition of the population decline, the Arizona Game and Fish Department, in conjunction
25  with the FWS, issued press releases identifying the declining population and recognizing
26  drought as a significant factor.  The press releases also recognized other significant factors
27  leading to the decline, including predation.

28

1    The FWS began to study the decline in the bighorn sheep population.  An
2    Investigative Report and Recommendation was prepared, which addressed some of the
3    possible factors in the population decline.  They include: 1) the population's response to
4    drought; 2) water availability; 3) predation; 4) disease; 5) human disturbance; 6)
5    transportation; and 7) hunting.

6    The Investigative Report specifically discussed water availability as a significant
7    factor affecting the population.  It discussed the biology of bighorn sheep, noting that
8    summer temperatures, reduced moisture content of forage, and mating activities necessitated
9    additional water intake, and thus reliable water sources.  One of the objectives listed in the
10   report was to ensure year round water availability to the bighorn sheep.  The report also
11   noted that redevelopment of existing water sources could be completed using new techniques
12   to decrease the visual impact of the site.

13   The Investigative Report also discussed predation as a factor in the decline of the
14   bighorn sheep population.  The Report noted that research efforts should continue in order
15   to examine the effects of mountain lions preying on bighorn sheep, as the overall impact of
16   lion predation on the sheep population was unknown.  Further, the Investigative Report
17   discussed hunting as a factor in the population decline.

18   B.  Implementation of the Recommendations from the Investigative Report

19   Based on the Investigative Report and Recommendation, the FWS decided to redesign
20   water sources to capture and store rain more effectively.  The FWS considered the project
21   a redevelopment[1] of two existing tanks, the "Yaqui" and "McPherson" tanks.

22   The project was designed to provide year-round water through the use of a series of
23   PVC pipes, 24 inches in diameter and 120 to 160 feet long, buried in the ground.  The tanks
24   hold approximately 13,000 gallons of water, with six-inch PVC pipes extending to water

25

26   [1]Although the FWS considered the tanks a redevelopment of two existing tanks, two
27   new tanks were built, and the "old tanks" were slated to "remain and not be modified."
     (Plaintiffs' Supplemental Statement of Facts, Dkt. #78-2) (citing to Administrative Record
28   ("AR") at p.136-37).

1   diversion structures placed in small, nearby washes.  The visible part of the structures consist

2   of the water diversions (approximately 12 inches high, constructed of concrete building

3   blocks covered with mortar) and the in-ground troughs.

4        As part of the process to implement the recommendations outlined in the report, the

5   FWS prepared an Environmental Action Statement, which invoked a "categorical exclusion"

6   from NEPA's reporting and public comment requirements.[2]  The use of a categorical

7   exclusion for small water control structures is permitted by FWS policy.

8        The water impoundments were constructed with use of backhoes, trucks and other

9   motorized vehicles that brought materials and water to the site.  The FWS consulted its

10  policy manual regarding the use of motorized vehicles in the wilderness area; it ultimately

11  determined that such use was permissible because it was "necessary to accomplish refuge

12  objectives."  (Federal Defendants' Separate Statement of Facts, Dkt. #90).  The FWS also

13  considered a 1997 Interagency Management Agreement and Environmental Assessment that

14  recognized that "allowing the use of motorized or mechanized equipment and vehicles for

15  maintenance, improvement, reconstruction, relocation, or emergency water supplementation

16  at existing wildlife waters would temporarily impact wilderness visitors (loss of solitude) and

17  wildlife (stress) but would provide for maintaining species diversities for the long-term."

18  (Id) (citing AR at p. 312).  The FWS detailed its decision to use mechanized equipment in

19  the  Minimum  Requirements  Analysis  it  prepared  for  the  project.   (See Minimum

20  Requirements Analysis and NEPA Worksheet, AR at p. 156-59).

21

22  ───────────────

23        [2]The purpose of NEPA is to ensure that federal agencies take into account the
    environmental consequences of their actions.  Neighbors of Cuddy Mtn. v. Alexander, 303
24  F.3d 1059, 1070 (9th Cir. 2002).  A central component of NEPA is the requirement that
    federal actions undergo public review in a notice and comment process.  40 C.F.R. §§
25  1500.2(d); 1506.6.  Some projects undertaken by federal agencies, however, are so routine
    and unlikely to cause significant environmental impacts that they may be conducted without
26  undergoing an environmental analysis.  These projects are conducted under what is referred
    to as a "categorical exclusion," and they require no public review or notice and comment
27  period.  40 C.F.R. § 1508.4.
28

1    The Plaintiffs' Amended Complaint alleges that the project violated NEPA because
2    it was improperly categorically excluded from documentation in an environmental
3    assessment or an environmental impact statement. (Dkt. #50). Further, the Plaintiffs argue
4    that the project was impermissibly revealed to hunting organizations whose members will
5    benefit from the project, but was not revealed to the organizations that favor wildlife and
6    wilderness protection. (Id.) The Plaintiffs also argue that the project violates the Wilderness
7    Act because it impermissibly impairs wilderness character. (Id.)

8                                  II.  Standard of Review

9        The Administrative Procedure Act ("APA") prescribes the standard of review for
10   challenges to agency actions under statutes that otherwise provide no private right of action.
11   Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 377 n.23 (1989). The agency
12   action must be upheld unless it is arbitrary, capricious, an abuse of discretion, or not
13   otherwise in accordance with the law. 5 U.S.C. § 706(2)(A); Natural Resources Defense
14   Council v. U.S. EPA, 526 F.3d 591, 602 (9th Cir. 2008). The reviewing court defers to the
15   agency if the decision is based on a permissible construction of the statute or regulations it
16   is entrusted to administer. Chevron USA, Inc. v. NRDC, Inc., 467 U.S. 837, 843 (1984).

17       In deciding an APA case, the scope of review is generally limited to the
18   Administrative Record that was before the agency decision-maker. Florida Power & Light
19   v. Lorion, 470 U.S. 729, 743 (1985). In such a case, motions for summary judgment are the
20   "appropriate mechanism for deciding the legal question of whether the agency could
21   reasonably have found the facts as it did." Occidental Engineering Co. v. I.N.S., 753 F.2d
22   766, 770 (9th Cir. 1985). The function of the reviewing court is not to resolve any disputed
23   issues of fact; rather the court is to "determine whether or not as a matter of law the evidence
24   in the administrative record permitted the agency to make the decision it did." Id. at 769.

25
26
27
28                                 III.  Discussion

A. Mootness

Preliminarily, the Court must address the Defendant's argument that the case is moot. The FWS asserts that the Plaintiffs' action has lost its character as a present, live controversy because the completion of the water tanks prevents the Court from granting effective relief. (Cross-motion for Summary Judgment, Dkt. #85).  The FWS asserts that where the challenged action has been completed, as here, Courts have consistently found that no effective relief may be granted and the case is moot.  (Id.)

The Plaintiffs, however, direct the Court's attention to a Ninth Circuit case that finds that environmental cases "do not become moot merely because the project has been completed; rather, the inquiry is whether relief can be granted."  (Reply and Response to Cross-motions for Summary Judgment, Dkt. # 98) (citing West v. Sec'y of the Dept. Of Trans., 206 F.3d 920, 924-26 (9th Cir. 2000)).  The Plaintiffs point out that they are seeking disablement or removal of the water impoundments by non-motorized means, or an order for the FWS to prepare an environmental assessment.[3]  Because the Court finds that either or both of these remedies could provide effective relief, the case is not moot.

B. Motion to Strike Extra Record Evidence

The FWS has moved to strike some extra-record evidence submitted by the Plaintiffs as an exhibit to the Motion for Summary Judgment.  (Dkt. #92).  The evidence to which the FWS objects includes:

1) The declaration of Tim Lengerich to establish the Plaintiffs' standing;

2) The declaration of Tina Marie Ekker to support the Plaintiffs' argument that public comment was not solicited for the project;

---

[3]The Court finds persuasive the language cited by the Plaintiffs from the West decision: "if the fact that the [contested projects were] built and operating were enough to make the case nonjusticiable . . . then the [defendant] and all similar entities could merely ignore the requirements of NEPA, build its structures before a case gets to court, and then hide behind the mootness doctrine."  (Reply and Response to Cross-motions for Summary Judgment, Dkt. # 98) (internal quotations and citations omitted).

3) Excerpts from a publication called <u>Counting Sheep</u> to explain bighorn sheep history and biology; and

4) The Arizona Hunting Guidelines.

(<u>Id.</u>)  The FWS argues that the Court's review is confined to the Administrative Record, and therefore, consideration of the extra-record evidence is inappropriate.  (<u>Id.</u>)

The Plaintiffs respond that several exceptions exist to the general rule limiting extra-record evidence, and that these exceptions apply to each of the challenged items of evidence. (Dkt. #96).

### 1.  Declaration of Tim Lengerich

The FWS concedes in its Reply that it does not object to the use of Lengerich's deposition for the purposes of attempting to establish standing.  (Dkt. #97).  Therefore, the Lengerich deposition is admitted for that purpose.

### 2.  Declaration of Tina Marie Ekker

The Plaintiffs submitted the Ekker declaration for support of their claim that the FWS did not solicit public comment for the water impoundment project.  The FWS objects on several grounds to the Court's consideration of this evidence, but admits to the Plaintiffs' underlying claim — i.e., that the FWS did not seek public comment for the project.  The Court treats the Plaintiffs' contention as established, and therefore consideration of the declaration is unnecessary.

### 3.  Excerpts from *Counting Sheep*

The Plaintiffs argue that extra-record materials, such as the excerpts from the publication <u>Counting Sheep</u>, are admissible to help the reviewing court determine "whether the agency considered all relevant factors and has explained its decision."  (Dkt. #96) (citing <u>Lands Council v. Powell</u>, 395 F.3d 1019, 1030 (9th Cir. 2005).  The Plaintiffs argue further that if the materials are needed to "explain technical terms or complex subject matter," they are admissible in the district court.  (<u>Id.</u>)

The Court does not consider the subject matter technical or complex, but will admit the materials for the purpose of considering whether the FWS failed to consider important

factors of bighorn sheep history and biology.  Although the FWS argues that it in fact considered many factors of bighorn sheep history and biology, that argument is better left reserved for the merits of the summary judgment motions, and not for support of its motion to strike.  The Court can better determine whether the FWS failed to consider an important aspect of the problem by reference to the issues it allegedly overlooked.

### 4.  Arizona Hunting Guidelines

The Plaintiffs seek to admit the Arizona Hunting Guidelines to support their contention that hunting is permissible at man-made water holes, such as the water impoundments at issue in this case. (Dkt. #96).  They argue that this concept is a "technical matter that would likely not be grasped by a non-hunting person."  (Id.)  Alternatively, the Plaintiffs urge the Court to take judicial notice of the hunting guidelines.

As with the declaration of Tina Marie Ekker,[4] however, the FWS admits to the Plaintiffs' underlying contentions. (Dkt. #97).  The Court therefore treats the Plaintiffs' claims about hunting at water holes as established, and thus resort to the Arizona Hunting Guidelines is unnecessary.

### C.  Motion to File Amicus Curiae Brief

An entity called Public Employees for Environmental Responsibility moved to file an amicus curiae brief in support of the Plaintiffs' Motion for Summary Judgment. (Dkt. #108). The Court notes that the FWS and the Interveners object on several grounds, arguing that the brief is an extra-record submission with no legal arguments, no citation to legal authority, and makes no reference to documents in the administrative record.  The Sportsmen's objection refers to it as "little more than an unsworn extra record declaration." (Dkt. #111). They also argue that it is inexcusably tardy.  (Id.)

Although the Court grants the motion to file the amicus brief for the reasons discussed above with respect to the excerpts from Counting Sheep, it does so with full cognizance of the brief's potential shortcomings and the Defendant's and Interveners' objections.

---

[4]See part III, section B.2 supra.

D.  The Use of Motorized Equipment and Construction of Permanent Structures Within the Wilderness Area

The Plaintiffs argue that both the use of motorized equipment and the construction of permanent structures within a wilderness area violate the plain language of the Wilderness Act.  The Wilderness Act provides:

> . . .except as necessary to meet minimum requirements for the administration of the area for the purpose of this chapter (including measures required in emergencies involving the health and safety of persons within the area), there shall be no temporary road, no use of motor vehicles, motorized equipment or motorboats, no landing of aircraft, no other form of mechanical transport, and no structure or installation within any such area.

16 U.S.C. § 1133(c).  According to the Plaintiffs, any exceptions regarding motorized equipment or permanent structures are read narrowly, and so the impoundments should be removed or rendered inoperable.  (Motion for Summary Judgment, Dkt. #78).

The FWS responds that Congress could have imposed a flat prohibition on motorized vehicles and structures or installations in the wilderness.  (Cross-motion for Summary Judgment, Dkt. #85).  Instead, Congress "gave agencies the ability to maintain structures when necessary to meet the minimum requirements for the administration of efforts to conserve wildlife resources of the lands."  (Id.)

Further, the FWS argues that it has additional — and sometimes conflicting — duties by virtue of the fact that the lands in question are also designated as a Wildlife Refuge under the National Wildlife Refuge System Improvement Act ("NWRSIA").  The FWS asserts that those duties required the FWS to take the affirmative actions here (including the use of motorized equipment and permanent water impoundments) in order to preserve and restore the bighorn sheep population.  The Court requested, and the parties provided, supplemental briefing on the issue of whether the Wilderness Act or the NWRSIA was controlling.  (See Dkt. #116, 117, 118 and 119).

1

1.  Wilderness Act and the NWRSIA

2

a.  The Plaintiffs' Supplemental Brief

3

The Plaintiffs argue that the NWRSIA is a general statute that does not act to

4

eliminate the specific protections afforded to wilderness lands by the Wilderness Act.  The

5

Plaintiffs argue that the NWRSIA explicitly declares that it only applies "subject to existing

6

state and federal law," and that the Wilderness Act is not similarly limited.  (Dkt. #117).

7

Wilderness, the Plaintiffs argue, is to be preserved in all cases as wilderness.

8

The Plaintiffs state that a specific statute cannot be controlled or nullified by a general

9

statute, regardless of the order in which the two statutes were enacted.  Here, the Wilderness

10

Act specifically designates wilderness land to be free of permanent improvements.  The

11

NWRSIA, in contrast, talks about the *general* need to conserve fish and wildlife without

12

specific instructions on how to accomplish that conservation.  Therefore, the Plaintiffs assert,

13

the more specific prohibitions in the Wilderness Act control.

14

The Plaintiffs also point out that the FWS is not permitted to violate federal law and

15

must therefore strive to meet the requirements of both the NWRSIA and the Wilderness Act.

16

Because nothing in the NWRSIA specifically requires the FWA to build new water

17

developments in contravention on the Wilderness Act's prohibition, the FWS could have

18

built the water impoundments, if they were required, on parts of the refuge that were not

19

designated as wilderness.

20

Finally, the Plaintiffs assert that the Ninth Circuit has not held that the NWRSIA is

21

controlling over the Wilderness Act where faced with similar issues.  For support, the

22

Plaintiffs cite to Wilderness Society v. Alaska Ctr. For the Environment, 360 F.3d 1374 (9th

23

Cir. 2004) (*en banc*), and Wilderness Watch v. Mainella, 375 F.3d 1085 (11th Cir. 2004).

24

b.  The FWS's Supplemental Brief

25

The FWS asserts in its supplemental brief that there is no irreconcilable conflict

26

between the two statutes, and therefore neither is controlling.  The two must be read together

27

to fulfill the mission of the refuge.  The FWS points to the exception in the Wilderness Act

28

that allows otherwise prohibited actions "where necessary to carry out the purposes of the

1   Act."   (Dkt. #116).   This language, according to the FWS, supports the agency's
2   interpretation that the two statutes can be harmonized.

3   Furthermore, the FWS argues that Congress noted that the designation of the lands as
4   wilderness was compatible with the purposes for which the refuge was established and
5   managed.   The management of bighorn sheep was one of the primary purposes of
6   establishing the refuge, and the Wilderness Act was not intended to change that.

7   The FWS points out that it has a policy that specifically addresses the effect of the
8   Wilderness Act on the refuge purposes.  The policy states that Wilderness Act purposes are
9   to be "within and supplemental" to the purposes of the NWRSIA.  The FWS interprets this
10  to mean that the wilderness purposes are additional purposes of the refuge, providing
11  additional considerations for determining the administrative and management actions needed
12  to achieve the refuge's purposes on designated wilderness areas.

13  Finally, the FWS argues that courts must regard each statute as effective if they are
14  capable of coexistence.  If one of the statutes is ambiguous with respect to an issue, the courts
15  must defer to the agency so long as it involves a permissible construction of the statute.  The
16  FWS asserts that it has implemented policies that enable it to give effect to both statutes;
17  therefore they do not conflict and neither is controlling.

18  c.  The State of Arizona's Supplemental Brief

19  The State of Arizona argues that neither statute must give way to the other; both
20  impose mandatory — yet compatible — obligations on the FWS.  Because the Wilderness
21  Act's purposes are "within and supplemental" to the purpose of restoring wildlife
22  populations, the actions taken were equally consistent with the Wilderness Act.  The
23  exception in the statute that allows non-conforming actions when necessary for refuge
24  purposes is therefore equally applicable to the Wilderness Act.  Because the actions involved
25  the least impact necessary to accomplish the refuge purpose, the State asserts, they were
26  permissible under the Wilderness Act.

27  The preference "is to harmonize statutes wherever possible."  (Dkt. #119).  The
28  FWS's reasonable harmonization here is entitled to deference.  Even if the Court did not

1   agree that the FWS reasonably harmonized the two statutes, the State argues, the NWRSIA

2   should control as the later-enacted statute.

3   　　　　　　　　　d.  The Sportsmen's Supplemental Brief

4   　　　　The Sportsmen assert that the NWRSIA overrides any seemingly contradictory

5   principles of the Wilderness Act.  In any event, both statutes require the FWS to preserve

6   species, so the Sportsmen argue that there is no actual conflict.  Further, the FWS complied

7   with all of the Wilderness Act's requirements.

8   　　　　The bighorn sheep were the primary concern in refuge establishment, the Sportsmen

9   argue.  Because the Wilderness Act is "supplemental to" the refuge designations, the

10  Wilderness Act was plainly intended to allow the FWS to engage in refuge-related

11  management activities.  If contradictory, the Sportsmen assert, the Wilderness Act takes a

12  backseat to the NWRSIA.

13  　　　　Finally, the Sportsmen argue that Congress has described the Wilderness Act as

14  "simply an overlay," prescribing terms and conditions for how land managers achieve the

15  refuge's existing purposes.  (Dkt. #118).  They assert that constructing the water tanks was

16  consistent with Congress' directives and in accordance with all statutory provisions, and that

17  this reasonable harmonization is therefore entitled to deference.

18  　　　　　　　2.  Analysis

19  　　　　The Court finds that the two statutes at issue are capable of coexistence, and that it

20  must regard each as effective.  Nigg v. U.S. Postal Service, 501 F.3d 1071, 1076 (9th Cir.

21  2007).  Further, the Court finds that the FWS engaged in a reasonable harmonization of its

22  obligations under each statute.  Alaska v. Watt, 451 U.S. 259, 267 (1981).

23  　　　　The purposes of the Wilderness Act are deemed to be "*within and supplemental* to the

24  purposes for which . . . national wildlife refuge systems are established and administered."

25  16 U.S.C. § 1133(a).  The FWS interprets this "within and supplemental" language to mean

26  that "wilderness purposes become additional purposes of the refuge, yet apply only to those

27  areas of the refuge designated as wilderness."  (Cross-motion for Summary Judgment, Dkt.

28  #13).  These wilderness purposes "provide additional considerations for determining the

- 12 -

1  administrative and management actions" needed to achieve the refuge's purposes on
2  wilderness lands.  (Id.)

3      This reasonable harmonization by the FWS is entitled to deference because Congress
4  has not expressed its intent on the issue of what to do when a potential conflict may arise
5  between the two statutes.  National Ass'n of Home Builders v. Defenders of Wildlife, __
6  U.S. __ , 127 S. Ct. 2518, 2534 (2007) (citing Chevron U.S.A. Inc. v. N.R.D.C., Inc., 467
7  U.S. 837, 843 (1984)).  If a statute is "silent or ambiguous with respect to the specific issue,
8  the question for the court is whether the agency's answer is based on a permissible
9  construction of the statute."  Chevron, 467 U.S. at 842-43.  The Court finds here that it is.

10                        a.  Permanent Structures

11      The FWS argues that the permanent water impoundments were "necessary to meet
12  minimum requirements for the administration of the area."  16 U.S.C. § 1133(c).  The
13  Plaintiffs assert that not only were the water impoundments not necessary, the FWS failed
14  to consider the detrimental effect the supplemental water might have on the natural balance
15  of the ecosystem.  (Motion for Summary Judgment, Dkt.#78).

16      The Plaintiffs argue that construction of the water impoundments modifies the area's
17  natural conditions "so that water is provided year-round where it otherwise would be scarce,
18  intermittent, or not exist at all.  As a consequence, animals that otherwise would not inhabit
19  the area because of the scarcity of water in the area's natural conditions, can now do so."
20  (Id.)  For support, the Plaintiffs cite to the disputed extra-record excerpts that discuss the
21  history and biology of bighorn sheep.  (Exhibits 2 and 3 to Motion for Summary Judgment,
22  Dkt. #80).

23      The excerpts provide support for the Plaintiffs' assertion that bighorn sheep can live
24  in places with little water and searing heat.  (Motion for Summary Judgment, Dkt.#78, 80).
25  The excerpts also discuss the significant threat that bighorn sheep face from predatory
26  animals including mountain lions.  (Id.)  These factors lend support to the Plaintiffs' concern
27  that the abundance of man-made waters in the Kofa Refuge might permit mountain lions to

28

survive in bighorn sheep territory that would otherwise be too arid for them to endure. (Motion for Summary Judgment, Dkt. #78).

One of the excerpts, however, specifically discusses the beneficial role played by "single species advocate groups."  (Exhibit 3 to Motion for Summary Judgment, Dkt. #80). It suggests that advocate groups for bighorn sheep, such as the Interveners here, have been particularly successful in their efforts, and have contributed funds and labor to sheep transplants and ***water improvement projects***.  (Id.)  The article goes on to say that the results of these advocate groups are <u>undoubtedly beneficial to sheep</u>, and that these groups are essentially deserving of encouragement.  (Id.)  Further, the excerpt seems to highlight the importance of "escape terrain" as a key factor in the bighorn's ability to avoid predation. (Id.)

The FWS points out that it considered both bighorn sheep biology and predation when determining whether the water impoundments were necessary.  (Reply in Support of Motion to Strike Extra Record Evidence, Dkt. #97).  The Minimum Tool Analysis prepared for the project noted that the bighorn sheep populations had declined to an estimated 390 sheep, down from an estimated 813 in 2000.  (AR at p. 154).  A joint news release by the Arizona Game and Fish Department and the FWS discussed, among other causes, drought, predation and hunting as factors for the decline.  (AR at p. 116-119).

Further, the Arizona Game and Fish Department prepared an "Investigative Report and Recommendations for the Kofa Bighorn Sheep Herd," which was approved by the FWS (AR at p. 392-430).  The Investigative Report provides a detailed analysis of sheep mortality factors and management strategies, including habitat considerations (population response to drought and water availability), biological considerations (predation, disease, human disturbance, translocations and hunting), and other considerations (livestock and burros, noxious and invasive plants, wildfires and mining).  (Id.)  Ensuring year-round water availability for bighorn sheep was one of the priority recommendations of the Investigative Report after consideration of the habitat and biological factors.  (AR at p. 10).

1    The FWS appears to have considered a multitude of relevant factors in sheep mortality
2 and management.  Having considered all of the critical factors, the FWS's decision to
3 construct the water impoundments — despite being contrary to the course of action (or
4 inaction) that the Plaintiffs might have taken — is entitled to deference.  "Agency action
5 passes muster under [the arbitrary, capricious, or abuse of discretion] standard of review
6 provided that the agency examine[s] the relevant data and articulate[s] a satisfactory
7 explanation for its action, including a rational connection between the facts found and the
8 choice made."  Hopi Tribe v. Navajo Tribe, 46 F.3d 908, 914 (9th Cir. 1995) (internal
9 quotations and citations omitted).

10    Accordingly, the Court finds that the construction of the water impoundments did not
11 violate the Wilderness Act.

12              b.  Motorized Equipment
13    The Plaintiffs argue that the use of motorized equipment violates the plain language
14 of the Wilderness Act.  The FWS argues, however, that as with the permanent water
15 impoundments, the use of motorized equipment was "necessary to meet minimum
16 requirements for the administration of the area."  16 U.S.C. § 1133(c).

17    The FWS points out that it relied on its Refuge Manual in determining whether the
18 use of motorized equipment was permissible.  (See AR at p. 329).  The Refuge Manual
19 provides that motorized equipment "may be used in special circumstances if it is the
20 minimum tool necessary to accomplish a task safely and without long term impairment of the
21 area's wilderness character."  (Id.)

22    The Minimum Requirements Analysis thoroughly discussed the use of motorized
23 equipment, as well as alternatives to the use of motorized equipment (including taking no
24 action, or completing the project through non-mechanized means).  (AR at p. 154-59).  The
25 FWS ultimately concluded that the use of motorized equipment constituted the minimum tool
26 necessary to safely accomplish the project.  The FWS determined that it could complete the
27 project relatively quickly (within a few days as opposed to weeks without mechanized

28

1   equipment), and could provide reliable water to wildlife during the summer of 2007 while

2   minimizing disturbance during construction.  (AR at p. 156).

3       The FWS also noted a concern about human health and safety if the projects were

4   completed using non-mechanized means.  The FWS cited to heat-related problems, back, leg

5   and ankle injuries and blisters.  (AR at p. 158).  Further, the FWS indicated that the extended

6   time needed to complete the projects by hand "would likely result in poor worker retention

7   and recruitment, placing additional work on those individuals willing to stay and complete

8   the projects."  (Id.)

9       Accordingly, the FWS determined that the use of motorized equipment constituted the

10  minimum tool necessary to accomplish the task safely and without long term impairment of

11  the area's wilderness character.  The Court finds that the agency's interpretation of its

12  regulations are entitled to controlling weight.  Alaska Center for the Environment v. U.S.

13  Forest Service, 189 F.3d 851, 857 (9th Cir. 1999).  The decision to use motorized equipment

14  was based on a permissible construction of the Wilderness Act and the NWRSIA, and is

15  therefore entitled to deference.  Chevron USA, Inc. v. NRDC, 467 U.S. 837, 843 (1984).

16  E. The Decision to Construct Water Impoundments Without Public Review or Comment and

17  the Use of a Categorical Exclusion

18      The Plaintiffs argue that the FWS violated NEPA by deciding to construct the water

19  impoundments without public review or comment and through the use of a categorical

20  exclusion.  Because no public review or comment is required if the agency appropriately

21  relied on a categorical exclusion, the Court need only address whether the categorical

22  exclusion was appropriately invoked.[5]

23  _____

24      [5]The parties acknowledge that some of the intervener groups volunteered time and
    materials to the water impoundment project.  The Plaintiffs suggest that this demonstrates
25  that the Interveners were impermissibly apprised of the action before it was completed and
    that, presumably, their input was considered.  Accordingly, the Plaintiffs argue that the
26  project was intentionally "conducted with notice to favored parties but in secrecy with
    respect to those who may oppose the project."  (Motion for Summary Judgment, Dkt. #78).
27  It was revealed in oral argument, however, that the Interveners have regular and ongoing
28  contact with the U.S. Fish and Wildlife Service.  The Court does not find that these facts

The Plaintiffs point out that NEPA "requires the federal government to prepare an environmental assessment or an environmental impact statement for all federal actions that 'may' have a significant impact on the environment." (Motion for Summary Judgment, Dkt. #78) (citing 42 U.S.C. § 4332(2)(C)).   A project may be categorically excluded from this requirement if it is one of a category of actions that the agency has consistently "found to have no significant cumulative or individual effects on the environment."   (Id.) (citing 40 C.F.R. § 1508.4).  Further, the project must not implicate any "extraordinary circumstances." (Id.)

The extraordinary circumstances that will prevent an action from being categorically excluded from the environmental assessment or environmental impact statement requirement include actions that may 1) have adverse effects on natural resources such as wilderness areas, 2) have highly uncertain environmental effects or may set precedent for future actions with potentially significant effects, or 3) have the potential to violate federal law.  (Motion for Summary Judgment, Dkt. #78) (citing the FWS's Department Manual Appendix 2, Ch. 2, at AR 249).

The Plaintiffs assert that the use of motorized equipment to construct these permanent water impoundments implicated each of these extraordinary circumstances, and thus was ineligible for a categorical exclusion.

1.  Adverse effects on natural resources such as wilderness areas

The Plaintiffs assert that the adverse effect on the wilderness area is caused by "disturbing the natural water regime and disrupting and modifying the ecology of the wilderness to favor some animals and components of the wilderness over others." (Motion for Summary Judgment, Dkt. #78).

The FWS responds that the Department of the Interior has promulgated specific categorical exclusions for the FWS that were subject to public notice and comment.  The

point to an unfairness in the public comment process, or that this contact amounted to an impermissible consideration of the input of only those who favored the project.  Accordingly, the Court must only consider whether the use of a categorical exclusion was appropriate.

categorical exclusions include "the construction of new, or the addition of, small structures or improvements," including "the construction of small water control structures." (Cross-motion for Summary Judgment, Dkt. #85) (citing the FWS's Department Manual, 516 DM ch. 8, sec. 8.5 at AR 257-61). Further, there is a categorical exclusion for "the reintroduction or supplementation (i.e., stocking) of native, formerly native, or established species into suitable habitat within their historic or established range, where no or negligible environmental disturbances are anticipated." (<u>Id.</u>) The FWS asserts that it relied on these categorical exclusions, and that their use is entitled to deference as not arbitrary, capricious, or an abuse of discretion.

The Court finds that the agency's interpretation of its regulations as allowing the water impoundment project to proceed under a categorical exclusion is entitled to controlling weight. <u>Alaska Center for the Environment v. U.S. Forest Service</u>, 189 F.3d 851, 857 (9th Cir. 1999) ("An agency's interpretation of the meaning of its own categorical exclusion should be given controlling weight unless plainly erroneous or inconsistent with the terms used in the regulation.").

The FWS appears to have thoroughly investigated the project and its effects, and concluded that a categorical exclusion was appropriate. It prepared an Environmental Action Statement, Minimum Requirements Analysis, and NEPA worksheets to document its conclusion. "Once the agency considers the proper factors and makes the factual determination on whether the impacts are significant or not, that decision implicates substantial agency expertise and is entitled to deference." <u>Id.</u> at 859 (citation omitted).

<u>2. Highly uncertain environmental effects or precedent-setting for future actions with potentially significant effects</u>

The Plaintiffs argue the decision to construct the water impoundments "comes with a decision to maintain them, probably for decades, with water trucks, hoses, and earth-moving equipment" within the wilderness area. (Motion for Summary Judgment, Dkt. #78).

Although the FWS does not dispute that the tanks may require some maintenance, it points out that the redesign of the water tanks was intended to "capture and store rainwater

more efficiently, greatly reducing the need to haul supplemental water." (Cross-motion for Summary Judgment, Dkt. #85); (Reply to Cross-motion for Summary Judgment, Dkt. #106). The FWS reported in oral argument that the previous design of the water tanks required additional disturbance to the wilderness area though the hauling of supplemental water to tanks that had become dry.  The increased efficiency of both capture and storage of run-off was intended to reduce the impact to the environment of water hauling.  The Court finds that this determination is entitled to deference.  Alaska Center for the Environment v. U.S. Forest Service, 189 F.3d 851, 857 (9th Cir. 1999).

3)  Potential to violate federal law

The Plaintiffs argue that the water impoundment project has an undeniable potential to violate the Wilderness Act because the express language of that Act forbids motorized equipment and permanent structures.

The Court notes that the language of the Wilderness Act prohibiting motorized equipment and permanent structures is subject to exception where "necessary to meet minimum requirements for the administration of the area."  16 U.S.C. § 1133(c).  Further, as discussed in part III, section D.2 supra, the Court finds that the FWS engaged in a reasonable harmonization of the two statutes controlling its actions on the land in question. Accordingly, the agency's conclusion that there were no extraordinary circumstances present that would require it to prepare an Environmental Assessment or Environmental Impact Statement is entitled to deference.  Alaska Center, 189 F.3d at 859.

## IV.  Conclusion

The Court finds that the decision to construct two permanent water impoundments using motorized equipment in an area designated as wilderness did not violate the Wilderness Act.  The Court also finds that the agency's actions did not require the FWS to provide public notice and comment, as they were undertaken pursuant to an appropriate categorical exclusion.

Accordingly,

1

**IT IS ORDERED** denying the Plaintiffs' Motion for Summary Judgment.  (Dkt. #78).

2

**IT IS FURTHER ORDERED** granting the Defendant's and Interveners' Cross-

3

motions for Summary Judgment.  (Dkt. #85, 81, and 93).

4

**IT IS FURTHER ORDERED** granting in part and denying in part the Defendant's

5

Motion to Strike the Plaintiffs' Extra-Record Evidence.  (Dkt. #92).

6

**IT IS FURTHER ORDERED** granting the Motion to File Amicus Curiae Brief by

7

Public Employees for Environmental Responsibility.  (Dkt. #108).

8

DATED this 5th day of September, 2008.

9

10

11

Mary H. Murguia

12

United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28